## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| LESLIE HILL, DANIEL QUACA, CHEYENNE QUACA, BOSCO'S TRUCKIN' 82, LLC, and TWO DOGS TRUCKING, INC., individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 22-CV-00910 |
| v. | |
| CARGO RUNNER CO., | Judge John Robert Blakey |
| Defendant. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Leslie Hill, Daniel Quaca, and Cheyenne Quaca (collectively "Individual Plaintiffs"), and their corporations, Bosco's Truckin' 82, LLC ("Bosco's") and Two Dogs Trucking, Inc. ("Two Dogs") (collectively "Entity Plaintiffs"), hauled cargo for Cargo Runner Co. ("Cargo Runner" or "Defendant") pursuant to lease agreements in 2020 and 2021. In this putative class action, Plaintiffs allege that Cargo Runner violated Truth-in-Leasing regulations ("TILR"), 49 C.F.R. § 376.12, with respect to the lease agreements and deductions it took from drivers' earnings; and violated the Illinois Wage Payment and Collection Act (the "IWPCA"), 820 Ill. Com. Stat. 115/1, in how it classified, paid, and reimbursed drivers. [26]. Defendant now moves to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6). [31]. For the reasons explained below, the Court grants in part, and denies in part, Defendant's motion [31].

Case: 1:22-cv-00910 Document #: 55 Filed: 09/25/23 Page 2 of 33 PageID #:428

## I.    Factual Allegations[1]

Defendant Cargo Runner, a motor carrier organized and doing business in Illinois, uses "company drivers" and "contractor drivers" to transport cargo in interstate commerce.  [26] at ¶¶ 2, 13, 20–21.

Cargo Runner employs "company drivers" directly and provides the drivers with the trucks and trailers to haul cargo, paying them per mile driven.  *Id.* ¶ 78. Cargo Runner requires all company drivers to attend an unpaid one-and-a-half day orientation program, which teaches them about Defendant's policies, procedures, and systems and does not focus on the truck driving industry at large.  *Id.* ¶¶ 79–83.

In contrast, Defendant requires that "contractor drivers" form corporate entities through which the drivers perform cargo delivery services for Defendant.  *Id.* ¶¶ 26–32.  As part of this, the corporate entity leases a truck from Defendant pursuant to a Master Vehicle Lease Agreement (hereinafter "Master Agreement"). *Id.* ¶¶ 84–85; [26-7].  Then, the corporate entity leases the truck back to Defendant and performs delivery services for Defendant with that truck pursuant to an Independent Contractor Lease Agreement (hereinafter "Lease Agreement").  [26] ¶¶ 26–32, 75; [26-1]; [26-2]; [26-3]; [26-4].  Defendant presents these "standard form

---

[1] The Court draws the facts from the Amended Complaint, [26] (hereinafter "Complaint"), which it takes as true for purposes of deciding the present motion.  *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).  The Complaint also attaches various agreements and settlement statements, which the Complaint relies upon and which Plaintiffs and Defendant rely upon in arguing the motion to dismiss.  Accordingly, the Court also considers those materials in deciding Defendant's motion to dismiss.  *See id.* (holding that, on a motion to dismiss, a court may consider "the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." (internal citations omitted)).

agreements" to company drivers "on a take-it-or-leave-it basis, without the opportunity for negotiation." [26] ¶ 27.

Initially, Individual Plaintiffs Leslie Hill, Daniel Quaca, and Cheyenne Quaca worked as "company drivers" for Cargo Runner. [26] at ¶ 77. Then in 2021, they became "contractor drivers," entering into Master Agreements and Lease Agreements with Defendant through corporate entities that they formed—specifically the named Entity Plaintiffs in this case, Bosco's Truckin' 82, LLC (organized by Plaintiff Leslie Hill) and Two Dogs Trucking, Inc. (organized by Plaintiff Cheyenne Quaca). *Id*. ¶¶ 9–10, 26–38, 84.

Under their Lease Agreements, the Entity Plaintiffs received a percentage of an agreed-upon freight rate for each shipment that a contractor driver delivered. *See, e.g.,* [26-1] at 17 (Appendix A). The Lease Agreements also permitted Defendant to deduct numerous charges, fees and amounts from their final payment, however, and included various conditions for payment. Defendant provided the final payment amount in a Settlement Statement. *See, e.g.,* [26-5]. The deductions, charges and fees routinely exceed 15 percent of an agreed-upon freight rate. In fact, Defendant once deducted nearly 73 percent from a payment to Plaintiff Leslie Hall (through her company Plaintiff Bosco's Truckin' 82 LLC). [26] ¶ 99–100.

Plaintiffs allege that these deductions, fees, charges and other terms contained in the Lease Agreements violated the Truth-in-Leasing Act ("TIL Act"), 49 U.S.C. § 14704, and Truth-in-Leasing regulations ("TIL regulations"), 49 C.F.R. § 376, *et seq*. Namely, Count I alleges that Defendant violated the TIL regulations by failing to

include certain disclosures in the Lease Agreements; taking improper deductions; and failing to properly maintain, account for, and return escrow funds. [26] (Count I). Plaintiffs, in Count II, also allege that Defendant violated the Illinois Wage Payment and Collection Act ("IWPCA"), 820 Ill. Comp. Stat. 115/1 *et seq*. by misclassifying contractor drivers as independent contractors rather than employees; failing to pay wages; taking impermissible deductions from wages; and failing to reimburse drivers for work-related expenses such as tolls and fuel. [26] (Count II).

Plaintiffs bring both claims on behalf of themselves and putative classes of individuals and entities that provided cargo delivery services for Defendant, either as company drivers or contractor drivers. *Id*. ¶¶ 11, 102–12. On behalf of themselves and these putative classes, they seek a declaratory judgment that the lease agreements violate TIL regulations and are unlawful; injunctive relief to require compliance with TIL regulations and the IWCA; monetary damages; restitution; and IWCA penalties, among other things. *Id*. ¶ 126.

Now, Defendant moves to dismiss the TIL regulation claim (Count I) pursuant to Federal Rules of Civil Procedure 12(b)(1) and (12)(b)(6), arguing that the Complaint fails to establish any plausible injury from a TIL regulation violation. [32] at 6–14. It also argues that, as to some of the alleged violations, the attached Lease Agreements show they actually comply with TIL regulations. *Id*. Defendant also moves to dismiss Count II pursuant to Rule 12(b)(6), arguing that Plaintiffs fail to allege an agreement to pay the alleged wages; the IWPCA does not prohibit the deductions that Defendant took from Plaintiffs' compensation; and the IWPCA does

not require Defendant to reimburse Plaintiffs for the complained-of expenses. *Id.* at 14–19.

## II.    **Legal Standard**

A motion to dismiss pursuant to Rule 12(b)(1) challenges the jurisdictional basis for claims, either on the face of the complaint, or by presenting facts that call into question whether standing exists. *See Apex Digital, Inc. v. Sears Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009). Here, Defendant asserts a facial challenge. [32] at 13–14. In evaluating facial challenges, a court examines the complaint to "see if the plaintiff has sufficiently *alleged* a basis of subject matter jurisdiction." *Id.* at 443–44. In doing so, it accepts as true all well-pled factual allegations and draws all reasonable inferences in favor of the plaintiff. *Id.*

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain a "short and plain statement of the claim" sufficient to plausibly demonstrate entitlement to relief. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a Rule 12(b)(6) motion, courts construe the complaint in the light most favorable to the plaintiff and accepts as true all well-pled allegations. *See United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018) (citing *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016)). But a court "may reject sheer speculation, bald assertions, and

5

unsupported conclusory statements." *Taha v. Int'l Bhd. Of Teamsters, Loc.* 781, 947 F.3d 464, 469 (7th Cir. 2020).

## III. Legal Analysis

### A. Count I: TIL Regulations Violations

Plaintiffs allege in Count I that Defendant violated the TIL Act, 49 U.S.C. § 14102(a)(4), and the corresponding TIL regulations, 49 C.F.R. § 376.12. The TIL Act and TIL regulations strive to "promote full disclosure between the carrier and owner-operator in the leasing contract, to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry, and to eliminate or reduce opportunities for skimming and other illegal practices," 43 Fed. Reg. 29812; *see also Brant v. Schneider Nat'l, Inc.,* 43 F.4th 656, 678 (7th Cir. 2022). The TIL Act enables owner-operators to bring civil claims against authorized carriers for alleged TIL regulation violations. *See* 49 U.S.C. § 14704(a).

To pursue a claim under 49 U.S.C. § 14704(a) for TIL regulation violations, an owner-operator must allege sufficient facts for a court to "plausibly infer that" the carrier "violated one or more of the regulations" and that the owner-operator "was damaged as a result." *Brant*, 43 F.4th at 678; *see also Owner-Operator Indep. Drivers Ass'n (OOIDA) v. Landstar Sys., Inc.,* 622 F.3d 1307, 1325 (11th Cir. 2010) (collecting cases) (finding that "courts that have considered this issue have reached the conclusion that § 14704(a)(2) requires evidence of actual damages").

Here, although Plaintiffs bring their TIL regulation claim in a single count, the Complaint sets out numerous ways that Defendant allegedly violated the

regulations. Namely, Plaintiffs allege that Defendant: (1) made improper deductions from escrow funds; (2) failed to provide adequate disclosures about escrow fund and maintenance fund deductions; (3) improperly withheld escrow fund and maintenance fund balances upon termination; and (4) failed to pay interest on escrow and maintenance fund balances. [26] at ¶¶ 45, 52–53. They also allege that Defendant failed to properly disclose and overcharged or improperly charged them for: (1) various "chargebacks"; (2) fuel; and (3) insurance. *Id*. ¶¶ 54–69. Finally, they also allege that Defendant improperly delayed making payments and set impermissible conditions on payment. *Id*. ¶¶ 71–73.

In moving to dismiss Plaintiffs' TIL regulation claim, Defendant argues that the Lease Agreements refute some of the alleged violations. Defendant also argues that, in any event, Plaintiffs fail to plausibly allege damages or concrete injury from any alleged TIL regulation violation.

As a preliminary point, both the Individual and Entity Plaintiffs assert Count I. [26] at 22. But as Defendant notes, only the Entity Plaintiffs signed the Lease Agreements at issue and constitute the defined owner-operators. Therefore, the Entity Plaintiffs—not the Individual Plaintiffs—are the proper parties to bring a claim under 49 U.S.C. § 14704(a) for TIL regulation violations. Accordingly, the Court dismisses Count I as to the Individual Plaintiffs.

Now, the Court considers whether the Complaint otherwise alleges plausible TIL regulation violations and, if so, whether the Complaint plausibly alleges that the Entity Plaintiffs suffered an injury in fact as a result.

7

1.    **Escrow Funds**

Section 376.12(k) of the TIL regulations governs the use of escrow accounts in leasing agreements.  49 C.F.R. § 376.12(k).  It requires that lease agreements specify how much an owner-operator must pay into an escrow fund and the "specific items to which the escrow fund can be applied." *Id*.  It also requires that the carrier provide an accounting of escrow fund transactions either by "clearly indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow funds" or by "providing a separate accounting to the lessor of any transactions involving the escrow fund."  *Id*.  Finally, it requires that carriers pay interest on escrow funds at least quarterly and return escrow funds within 45 days of lease termination along with a final accounting of deductions.  *Id*.

Here, the Lease Agreements include an escrow account provision, which provides that Defendant may deduct $200 per week from an Entity Plaintiff's compensation until the account reaches at least $2,000.  *See, e.g.,* [26-1] at ¶ 11.  The provision also provides that Defendant may draw from the escrow funds to cover myriad charges: fuel, tolls, equipment licenses and charges, trailer rental, load revenue proration, certain repair costs, various types of liability insurance, damaged or missing goods, traffic fines or penalties, overpayments, excessive mileage, towing and storage services, cash advances, lease payments, fees for failure to communicate with Defendant, litigation fees, cash card usage, or payments for services performed.  *See id.* at ¶¶ 8–10, 12, 15, 17.  It further specifies that Defendant must provide "a

written explanation and itemization of all deductions for cargo or property damage" and must pay interest on the escrow balance. [26-1] at ¶ 11.

Separately, the Lease Agreements also include a maintenance account provision, stating that Defendant may deduct $0.10 per mile from compensation to fund this account. *See, e.g.,* [26-1] at 20 (Appendix D). The Lease Agreement provides no other terms governing the maintenance fund.[2]

The Complaint alleges that Defendant violated § 376.12(k) with respect to these escrow and maintenance accounts because the Lease Agreements failed to: (1) state that Plaintiffs could demand an accounting of escrow/maintenance transactions; (2) state that the escrow and maintenance account balances would be returned to drivers within forty-five days; or (3) adequately specify the charges to which Defendant could apply funds from the escrow account or maintenance account. [26] at ¶¶ 42.a–42.c, 48.a. Plaintiffs also allege that Defendant violated § 376.12(k) by: (1) failing to pay interest on the escrow and maintenance accounts; (2) making unlawful deductions from the accounts; and (3) refusing to return account balances to Plaintiffs. *Id.* at ¶ 45.b.

Each of these allegations provide numerous plausible violations of 49 C.F.R. § 376.12(k), and the attached Lease Agreements support these allegations. Namely, the Lease Agreement discloses nothing about the maintenance account other than the amount Defendant will deduct from Plaintiffs' compensation to fund it—notably,

---

[2] Courts have routinely found that "maintenance accounts" qualify as escrow accounts under TIL regulations. *See, e.g., Owner-Operator Indep. Drivers Assoc., Inc. v. C.R. England, Inc.,* 508 F. Supp. 2d 972 (D. Utah 2007).

it does not specify how Defendant will use the fund; whether Plaintiffs may request or receive an accounting; whether Defendant will pay interest on it; or if Defendant will return it at the end of the lease.[3]

Further, with respect to the escrow account, the Lease Agreements do not specify that Plaintiffs may request an accounting. *See* [29-1]–[29-4]. And although the Lease Agreement states Defendant will return the escrow funds within 45 business days, § 376.12(k) requires that the lease specify "45 days," and the TIL regulations require strict compliance. *See Yata v. BDJ Trucking Co.*, No. 17-cv-03503, 2021 WL 1738520, at *2–3 (N.D. Ill. May 3, 2021) (collecting cases) ("the repeated use of the word 'shall' suggests the necessity of full compliance with the statute."). More importantly, however, the Lease Agreements provide conditions on the return even after 45 business days, and § 376.12(k) clearly states that "*in no event shall the escrow fund be returned later than 45 days from the date of termination.*" (emphasis supplied). Thus, the plain language of the Lease Agreements violates this regulation with respect to both the number of days for return and the conditions it placed on its return. In short, all of these allegations plausibly establish disclosure violations under § 376.12(k).

Besides these plausible violations with respect to the Lease Agreements' disclosures, Plaintiffs also allege that Defendant applied the escrow funds to charges other than those disclosed in the Lease Agreement. And, although the Lease

---

[3] Defendant argues that Entity Plaintiff Two Dog Trucking, Inc cannot maintain a claim based upon maintenance funds because one of its Lease Agreements did not include a maintenance account provision. [32] at 10 n. 7 (citing [26-4]). But its earlier signed Lease Agreement did include a "maintenance account" charge without any of the requisite disclosures. [26-3] at 20 (Appendix D).

Agreement states that Defendant will pay interest on the escrow funds, Plaintiffs allege Defendant failed to do so.  These too constitute plausible violations.[4]

### 2.    Charge Backs for Equipment, Fuel, Insurance, and Other Expense

Section 376.12(h) of the TIL regulations states that a leasing agreements must "clearly specify all items that may be initially paid for by" a carrier "but ultimately deducted from" the owner-operator's "compensation" and must include "a recitation as to how the amount of each item is to be computed."  Carriers must also provide the owner-operators with documents "which are necessary to determine the validity of the charge."  49 C.F.R. § 376.12(h).

Section 376.12(h) aims to "prevent[] carriers from hiding fees until the charges have already been incurred and allow[] lessors to make informed decisions about

---

[4] In some instances, courts find that conduct inconsistent with lease provisions merely constitute a breach of the lease agreement, not a TIL regulation violation.  For example, in *Luxama v. Ironbound Express, Inc.*—a case Plaintiffs cite for a different proposition—a New Jersey district court held that overcharging for insurance breached the lease, but it did not qualify as a TIL regulation violation.  No. 11-2224, 2021 WL 1153145, at *17 (D.N.J. Mar. 26, 2021) ("The fact that Defendant did not comply with Paragraph 17 by overcharging Plaintiffs means that Defendant breached the Lease not that the language of the Lease does not comply with the Regulations."); *see also Maradiaga v. Intermodal Bridge Transp., Inc.*, 899 F.Supp.2d 551, 562 (N.D. Tex. 2012) (holding that a carrier who fails to compensate an owner-operator in compliance with the lease terms may have breached the lease, but it did not violate § 376.12).  Yet, other courts emphasize that the TIL regulations not only require that a lease contain certain disclosures and provisions, but also that those "required lease provisions *shall be adhered to and performed* by the authorized carrier."  *Mervyn v. Nelson Westernberg, Inc.*, 76 F. Supp. 3d 715, 718 (N.D. Ill. 2014) (quoting 49 C.F.R. § 376.12 (emphasis added)).  Thus, the *Mervyn* Court held that even if the lease agreement includes what the TIL regulations require, a carrier still violates the TIL regulations if it fails to carry out those requirements.  *Id.* at 719.  The court in *Cervantes v. CRST International, Inc.* provided an added nuance.  No. 20-cv-75, 2021 WL 7185068, at *6 (N.D. Iowa, Feb. 4, 2021).  There, the court agreed with the *Mervyn* holding, but held that § 376.12 only requires carriers to "follow the lease terms explicitly required under Section 376.12"; it does not require carriers to "adhere to voluntary, contractual lease provisions that happen to relate to the same subject matter."  *Id.*  Here, Defendant failed to raise any arguments based upon *Cervantes* or *Mervyn*, so the Court does not consider whether any of the alleged violations here constitute mere "voluntary, contractual lease provisions."  And regardless, the Complaint alleges many disclosure violations, in addition to alleged failures to adhere to Lease Agreement terms, so such arguments would not prove dispositive of Plaintiffs' singular count for TIL regulation violations.

where to seek products and services." *OOIDA v. Swift Transport Co., Inc. (Swift Transport II)*, 632 F.3d 1111, 1115 (9th Cir. 2011); *see also Fox v. TransAm Leasing, Inc.*, 839 F.3d 1209, 1215–16 (10th Cir. 2016); *Landstar Sys.*, 622 F.3d at 1317 ("It is only fair that the Owner-Operators be put on notice how their compensation is specifically being reduced."). In other words, the requirement seeks to ensure that owner-operators have notice, in advance, of the charges they may incur.

Here, Plaintiffs allege that Defendant violated § 376.12(h) by failing to properly disclose multiple charge-backs. Namely, Plaintiffs complain about: (1) a $60 per week charge for a "Tag Program"; (2) a $30 per week charge for an "electronic logging device"; (3) a $18 per week charge for "PrePass" (an intelligent transportation system); and (4) a $500 administrative fee for failing to communicate with Defendant for 12 hours while under dispatch or 48 hours while not under dispatch. [26] ¶ 54. Plaintiff Leslie Hill also complains about Defendant charging $10 for "transflo,", *id.* at ¶ 56, and Plaintiffs Daniel and Cheyenne Quaca complain about Defendant charging $10 for "Tablet internet," *id.* ¶ 57. Plaintiffs also allege that Defendant overcharged them for fuel. The Court considers each category below.

### a) Charges for Equipment and "Failing to Communicate"

At this stage, the Court finds that Plaintiffs plausibly alleged violations related to the $18 PrePass charge, the $10 "Transflo" charge-back for Plaintiff Leslie Hill (or, more properly, her corporate entity, Bosco's Truckin' 82 LLC), and the $10 "Tablet

12

Internet" charge-back for Plaintiffs Daniel and Cheyenne Quaca (or, more properly, their corporate entity, Two Dogs Trucking).[5]

Specifically, the Complaint alleges that Defendant charged $18 per week for "PrePass," yet Appendix D to the Lease Agreements lists the charge as $18 per month. [26] ¶ 54.d; [26-1]–[26-4] (Appendix D).[6] Similarly, the Complaint alleges that Defendant charged Bosco's Trucking $10 per week for "Transflo" even though Appendix D to the Lease Agreement lists "Transflo" at $5 per week, [26-1] (Appendix D). Next, the Complaint alleges that Defendant charged Two Dogs Trucking $10 per week for "Tablet Internet" even though the Lease Agreement states "n/a" for this line item charge. [26-3] (Appendix D). These allegations, taken as true at this stage, plausibly establish that Defendant violated § 376.12(h) by charging amounts inconsistent with the Lease Agreement disclosures.

The allegations with respect to the "Tag Program," "electronic logging device," and "failure to communicate" charges, however, prove different. For these, the Lease Agreements disclose the exact amount that the Complaint alleges Defendant charged. Namely, the Lease Agreements specify a $60.00 per week charge for the "Tag Program" and that this "payment will include an apportioned tag, 2290 obligations, and an administrative fee." [26-1] at 18 (Appendix B). For an "electronic logging device," the Lease Agreements provide that the owner-operator "shall pay $30 per

---

[5] The Complaint references Individual Plaintiffs Leslie Hill, and Daniel and Cheyenne Quaca with respect to these allegations, but the Lease Agreements are between Defendant and the Entity Plaintiffs Bosco's Truckin' 82 LLC and Two Dogs Trucking, the respective corporate entities that these Individual Plaintiffs formed. [26] ¶¶ 56, 57.

[6] Defendant insists that it only made monthly deductions, [32] at 11 n.8, but the Court takes as true Plaintiffs' allegation that Defendant charged it weekly.

week for the rental and usage of the equipment." [26-1] at 19. For the "failure to communicate," the Lease Agreements specify that Defendant will charge a "fee of $500.00" if an owner-operator "fails to communicate with" Defendant "for 12 hours while under dispatch or 48 hours if not under dispatch." [26-1] at 7.

Plaintiffs do not dispute that the Lease Agreements disclose the amount Defendant will charge, but they argue that Defendant still violated § 376.12(h) because Defendant failed to disclose that the charges include a mark-up.[7] [38] at 8– 9. Defendant disagrees, arguing that the regulations only require that carriers disclose the amount of a charge-back and do not forbid a carrier from profiting from charge-backs. [32] at 10–11; [43] at 8–10.

Courts overwhelmingly hold that "profiting from charge-backs is not per se unlawful." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ) ("Swift II")*, 632 F.3d 1111, 1117 (9th Cir. 2011); *see also, e.g., OOIDA v. Landstar Sys., Inc. ("Landstar II")*, 622 F.3d 1307, 1320 (11th Cir. 2010); *OOIDA v. C.R. England, Inc.,* 508 F. Supp. 2d 972, 981 (D.Utah 2007) ("[C]harge-backs that include profits and fees are not *per se* unlawful under § 376.12(h)...."). This Court agrees based upon the plain language of the regulations. But that does not resolve the separate question of what a carrier must disclose about a charge-back that includes a mark-up. The Seventh Circuit has not opined on this precise issue, but decisions

---

[7] In their response, Plaintiffs also argue that a different TIL regulation provision, § 376.12(i), requires that the lease state that owner-operators are not required to rent or buy any products from a carrier. [38] at 8. While true, the Complaint does not allege a § 376.12(i) violation and Plaintiffs may not amend the Complaint through their response brief.

from the Ninth and Eleventh Circuits prove highly instructive. *See Swift II*, 632 F.3d 1111, 1117 (9th Cir. 2011); *Landstar II*, 622 F.3d 1307, 1320 (11th Cir. 2010).

In *Swift II*, the lease agreement disclosed flat fee charges and also specified, generally, that the amount included a mark-up for administrative fees. *See Swift II*, 632 F.3d at 1114. The plaintiff argued, however, that § 376.12(h) required that the carrier disclose more than just "the fact that certain charges included mark-ups"; instead, plaintiff insisted that it must disclose "the complete methods by which such charges are calculated, including documentation of their costs to third parties and profits realized." *Id.* at 1116. The district court and the Ninth Circuit, on appeal, disagreed. Instead, the Ninth Circuit found that disclosing the amount the carrier will charge provides the requisite notice and achieves § 376.12(h)'s purpose of "ensuring the carriers do not lure lessors to purchase goods from them with the false promise of at-cost or low charges, only to hit them later with charges that they were unaware of before they received their settlement statements." *Id.* at 1118.

Notably, the lease agreement in *Swift II* disclosed the existence of the mark-up, so the Ninth Circuit emphasized that its decision does not address "whether the regulations mandate that carriers disclose the existence of mark-ups." *Id.* at 1116. But the court's reasoning suggests that § 376.12(h) does not require disclosing the existence of a mark-up so long as the lease agreement discloses the exact amount the carrier will charge. After all, as the *Swift II* Court emphasized, § 376.12(h)'s disclosure requirement seeks to ensure lessors know beforehand how much they will be charged and so they can "purchase their goods and services elsewhere if they can

15

find a better deal." *Swift II*, 632 F.3d at 1118. Disclosing an exact amount achieves that purpose.

Further, in reaching its decision, *Swift II* relied upon the Eleventh Circuit's decision in *Landstar II*. *See Swift II*, 632 F.3d at 1116–22. Although the lease agreement in *Landstar II* also disclosed flat fee charges along with the fact of a mark-up, 622 F.3d at 1319–23, the Eleventh Circuit, after discussing the regulatory history, broadly held that § 376.12(h) "does not require" the carrier to "do more than disclose the flat-fee in the lease and follow up with settlement statements that explain the final amount charged back." *Id.* at 1320. In other words, *Landstar II* did not limit its holding the way that the *Swift II* Court did.

This Court finds that those circuits' reading of § 376.12(h) comports with the provision's plain language and overall purpose. Applying that reasoning to the disclosures here, the Court agrees with Defendant that Plaintiffs have not alleged a plausible § 376.12(h) violation with respect to the "Tag Program," "electronic logging device," and "failure to communicate."

Namely, the disclosure for the "Tag Program" charge plainly complies with § 376.12(h), even under the narrower holding of *Swift II*, since the Lease Agreements not only specify the exact charge but state the charge includes an "administrative fee." [26-1] at 18 (Appendix B). As for the "electronic logging device" charge, the Lease Agreements do not indicate whether the charge includes a mark-up, but the Lease Agreement discloses a flat fee for the rental and use of the device. That satisfies the disclosure requirements.

16

Finally, there is the charge for "failing to communicate."  As a preliminary point on this charge, Plaintiffs fail to explain how § 376.12(h) applies, since it only governs "items that may be initially paid for by the authorized carrier but ultimately deducted from the lessor's compensation."  Nothing suggests that a charge for "failing to communicate" qualifies as either an "item" or something that Defendant pays for in the first instance.  Instead, it is more akin to a penalty.  But even putting this aside, the Lease Agreements specify the exact amount that Defendant will charge and under what circumstances it will charge the fee.  Thus, even if § 376.12(h) applies, the Lease Agreements satisfy the disclosure requirement.

### b)  Fuel Charges

Plaintiffs also allege that Defendant violated § 376.12(h) with respect to fuel charges.  Namely, the Complaint alleges that Plaintiffs charged fuel onto a fuel card in Defendant's name, but that Defendant deducted from Plaintiffs' compensation more than the amount Plaintiffs charged on the fuel cards.  [26] ¶¶ 64–68.  In support, Plaintiffs attach to their Complaint example settlement statements that show columns for "Gallons" and "Fuel ($)" and then an "Amount" column with the total Defendant actually charged.  The "Amount" column consistently shows a higher amount than the "Fuel ($)" column, sometimes totaling hundreds of dollars more.  *See* [26-5] at 2; [26-6] at 2; [26-8] at 2.

Plaintiffs argues that this overcharge violated § 376.12(h) because the Lease Agreements do not disclose it.  Instead, the Lease Agreement states that if Plaintiffs choose "to utilize a charge or cash card issued in Carrier's name for the purpose of

purchasing fuel," then "such charges will be deducted from" their "settlement or escrow/security deposit." [26] ¶ 64. Further, the Lease Agreements state that if Defendant "receives a discount for purchasing fuel," then it "will pass along the at-pump discount" but it "will not pass along any rebates or discounts later received from fuel vendors." *Id.*

In moving to dismiss, Defendant insists that any discrepancy in charges derives from after-the-fact discounts and rebates, or from "service fees or other purchases" such as "fuel for a refrigerated trailer, *i.e.* 'reefer fuel,' or a cash advance."[8]

Defendant's arguments fail, at least at this stage. Although the Lease Agreement states that Defendant "will not pass along any rebates or discounts later received from fuel vendors," it states that Defendant "will pass along the at-pump discount." [26-1] ¶ 15. The current record provides no basis to find that the "rebates or discounts later received from fuel vendors" account for the discrepancy. Further, the other explanations Defendant offers for the discrepancy—other purchases, reefer fuel, cash advances—if true, require evidentiary support not in the record.

In addition, aside from how the Lease Agreement describes the fuel charge, § 376.12(h) also requires that carriers provide information to owner-operators to support the validity and basis of the charges. The attached sample settlement agreements only show a "Fuel ($)" amount and a higher "Amount" charged without

---

[8] As to Plaintiff Bosco's Truckin' 82, LLC, the Court agrees that the Complaint misstates the amount of an alleged overcharge because the Complaint alleges a $406.29 discrepancy, *see* [32] at 12 n.9; [26] ¶ 66 (alleging $406.29 discrepancy), but the November 2021 Settlement statement states that $200 of that was a "cash advance," [26-5] at 2. Even excluding this $200 cash advance, however, that still leaves a $206.29 discrepancy.

18

any explanation for the discrepancy. On this, Defendant argues that the Plaintiffs should have kept "receipts of those purchases" to confirm the validity of the charges, [32] at 12, n. 9. But as another district court put it, § 376.12(h) does not allow a carrier "to require its owner-operators to play a game of connect-the-dots to figure out their charges." *Brinker v. Namcheck*, 577 F. Supp. 2d 1052, 1061 (W.D. Wisc. 2008). Section 376.12(h) puts the onus on *Defendant* to justify its variable-rate charge-backs. Plaintiffs plausibly allege that Defendant failed to do this with respect to the fuel charges.

### 3.    Insurance

Plaintiffs also allege that Defendant violated the TIL regulations regarding the amounts it charged them for insurance. Section 376.12(j) governs insurance charges and states that a lease agreement: (1) must specify that a carrier bears responsibility to maintain certain insurance; (2) shall "specify who is responsible for providing any other insurance coverage"; and (3) "if the authorized carrier will make a charge back. . . for any of this insurance, the lease shall specify the amount which will be charged-back." 49 C.F.R. § 376.12(j)(1).

Here, the Lease Agreements state that Plaintiffs "may elect to have Carrier provide insurance coverage required by this agreement and *deduct all costs* from the" settlements. [26-1] at ¶ 9.I (emphasis added). Appendix D to the Lease Agreements then specify a flat fee weekly amount for each type of insurance. *See* [26-2] at 20; [26-4] at 20.

Like Plaintiffs argued with respect to some of the equipment charge-backs and § 376.12(i), they argue that Defendant violated § 376.12(j) with respect to insurance charges because it charged a mark-up, [26] at ¶ 62, and the Lease Agreement did not disclose this mark-up. Plaintiffs insist that the Lease Agreements' uses the term "deduct all costs," which means that Defendant may not charge more than the cost Defendant incurred for the insurance. [38] at 9.

This argument fails for the reasons discussed with respect to mark-ups for other charges. Section 376.12(j) only requires that a lease "specify the amount which will be charged-back to the lessor" for insurance. Although the Lease Agreement states it will "deduct all costs," Appendix D of the Lease Agreements then notes the exact flat fee amount that Defendant will charge every week for each type of insurance. [26-1]–[26-4] (Appendix D). This leaves nothing to surprise, and plainly satisfies the disclosure requirement. Accordingly, Plaintiffs fail to allege a plausible violation of § 376.12(j) regulations on this basis.

### 4. Timing of Payment

Finally, the Complaint alleges that Defendant violated the TIL regulations with respect to timing and conditions of payment. [26] ¶¶ 71–74.

Section 376.12(f) governs timing and conditions of payment and provides, as relevant here, that:

> The lease shall specify that payment to the lessor shall be made within 15 days after submission of the necessary delivery documents concerning a trip in the service of the authorized carrier. The documentation required before the lessor can receive payment is limited to logbooks required by the Department of Transportation and

those documents necessary for the authorized carrier to secure payment from the shipper.

49 C.F.R. § 376.12(f). It also states that the carrier may require additional documentation "but not as a prerequisite to payment" and the carrier shall not make payment "contingent upon submission of a bill of lading to which no exceptions have been taken." *Id*.

Plaintiffs allege that Defendant violated § 376.12(f) in multiple ways. First, Plaintiffs allege that the Lease Agreements impermissibly condition payment upon drivers submitting "bills of lading" and "fully executed Carrier and shipper bills of lading." [26] ¶ 71(a). Plaintiffs insist this remains improper because these are not "documents necessary for the authorized carrier to secure payment from the shipper," § 376.12(f). In moving to dismiss, Defendant argues that a "signed bill of lading—the receipt for the carriage—is precisely the sort of document the regulation refers to" and therefore qualifies as "necessary" as a matter of law. [32] at 13.

The Court disagrees, at least based upon the record at this stage. Section 376.12(f) only explicitly refers to "logbooks," and while it refers to "bill of lading," it includes a qualifier that a carrier may not condition payment on a "bill of lading to which no exceptions have been taken." Defendant's argument, if factually supportable, remains one to take up on summary judgment on a full record.

Next, Plaintiffs argue that the Lease Agreements improperly authorize Defendant to withhold compensation for up to 30 days after the drivers submit the required documentation. *Id*. ¶ 71(b). For the first time on reply, Defendant insists that this provision only applies if a driver fails to *timely* submit documentation. [43]

21

at 11 n.5.  This argument, however—even if Defendant had not waived it by only raising it on reply—offers a distinction without a difference.  Section 376.12(f) states, without exception, that "payment to the lessor shall be made within 15 days after submission of the necessary delivery documents."  Plaintiff has alleged a plausible violation on this basis.

Finally, Plaintiffs argue that the Lease Agreement also improperly allows Defendant to withhold a final settlement payment for up to 45 days after the drivers prove "full compliance with the provisions of this Agreement."  *Id.* ¶ 71(c).  On this, Defendant does not dispute that it violates § 376.12(f)'s 15-day payment requirement, but merely argues that the Complaint fails to allege damages (which the Court addresses separately, below).  Thus, Plaintiff has alleged a plausible violation on this basis as well.

### 5.    Injury/Damages

The Seventh Circuit held in a recent decision, *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 678 (7th Cir. 2022), that a TIL regulation claim under 49 U.S.C. § 14704(a)(2) requires the plaintiff to "allege facts from which" a court can plausibly infer that the carrier "violated one or more of the regulations and that he was damaged as a result."

As detailed above, the Complaint alleges multiple plausible TIL regulations violations.  Defendant argues, however, that Count I still fails as a matter of law because the Complaint does not plausibly allege that Plaintiffs suffered resulting

injury or damages. [32] at 7–14. Defendant presents this theory as an issue of Article III standing under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6). *Id.*

To begin, Plaintiffs acknowledge *Brant*, but insist that "a plaintiff need not demonstrate actual damages with respect to *every single* alleged violation of the TIL regulations, but instead must merely demonstrate *some* damages." [38] at 6 (emphasis in original). *Brant* does not support Plaintiffs' position. To the contrary, the plaintiff in *Brant* alleged multiple TIL regulation violations and the Seventh Circuit analyzed whether the plaintiff plausibly alleged damages as to *each* violation—it did not merely find plausible damages as to one and consider the issue resolved. 43 F.4th at 678–80. Under the plain reading of *Brant* and 49 U.S.C. § 14704(a)(2)—which permits a plaintiff to seek recovery for damages sustained "as a result of an act or omission" in violation of TIL regulations—Plaintiff must plausibly allege actual damages as to each alleged violation.

With this in mind, the Court finds that the Complaint sufficiently pleads injury-in-fact and actual damages with respect to the viable TIL regulations violations discussed above. With respect to the escrow and maintenance funds, the Complaint not only alleges that Defendant failed to disclose the charges it would deduct, and that Plaintiffs had the right to request an accounting of the funds, but it also alleges that Defendant, in fact, withheld undisclosed and improper amounts.[9] Further, they allege that Defendant failed to pay interest or return funds upon

---

[9] Contrary to Defendant's insistence, even though the Complaint sometimes refers to "contractor drivers" or "drivers" rather than Plaintiffs, [26] ¶¶ 45, 48, these terms, read in context, plausibly refer to Plaintiffs. *See, e.g., id.*, ¶¶ 46 (alleging, for example, the entity Plaintiffs received no or little refund of escrow funds "due to Cargo Runner's unlawful deductions from escrow funds.").

termination. These allegations, taken as true, suffice to establish injury and actual damages—the loss of money.

In arguing to the contrary, Defendant insists that Plaintiffs suffered no harm because the Complaint admits that Plaintiffs "either had no escrow funds to return or they were returned." [32] at 8. Yet, the Complaint alleges that Plaintiffs had little to no escrow funds *because* Defendant took unauthorized and undisclosed deductions from them. Further, because the Lease Agreements did not disclose that Plaintiffs could demand an accounting, it prevented them from contesting any improper deductions or failure to pay interest. *See Brant*, 43 F.4th at 679 (finding sufficient allegations of harm where a Lease Agreement did not disclose the right to demand information to support payment amounts, thereby preventing the plaintiff "from contesting the alleged underpayment.").

Next, with respect to the alleged improper charge-backs for fuel, "PrePass", "Transflo", and "Tablet Internet", the Complaint not only alleges violations based upon improper disclosures, but it also alleges that Defendant, in fact, charged Plaintiffs a higher amount than specified in the Lease Agreements. Such overcharges, if true, sufficiently establish actual damages.

Finally, with respect to placing improper conditions on payments, Plaintiffs alleged that they suffered harm because Defendant, as a result of these improper conductions, withheld and/or delayed "payment of drivers' compensation." They also allege that, because they did not receive timely payments, "Plaintiffs were required to obtain 'cash advances,'" from Defendant that sometimes included an

"administrative fee." [26] ¶¶ 72–74.[10] These allegations also suffice to allege plausible actual damages.

Of course, Plaintiffs will have to prove their actual damages to survive summary judgment. But, at this stage, the Complaint plausibly alleges the Defendant's TIL regulation violations injured Plaintiffs.

As a final point on Plaintiff's TIL regulation claim, the Complaint seeks both monetary damages and permanent injunctive relief. Defendant argues that the Entity Plaintiffs "no longer work for Cargo Runner and, thus, they have no standing to seek injunctive relief." [43] at 12. On this, the Court agrees that the Entity Plaintiffs may have trouble establishing entitlement to injunctive relief if they no longer work for Defendant. *See, e.g., Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013) (holding that prospective injunctive relief requires "real and immediate threat of future violations."). But "standing and entitlement to relief are not the same thing" and when deciding questions of standing, a court should not pick apart a Complaint's "various components to separate the claims for which the plaintiff will be entitled to relief from those for which he will not." *Arreola v. Godinez*, 546 F.3d 788, 794–95 (7th Cir. 2008). As discussed above, the Complaint plausibly alleges that Plaintiffs suffered an "injury in fact" as to some of the alleged TIL

---

[10] Defendant argues that the sample Settlement Statements that Plaintiffs attached to the Complaint show that Plaintiffs did not incur administrative fees for cash advances. [43] at 12. Even if a cash advance reflected on a sample Settlement Statement does not show an administrative fee, that does not establish that no cash advance came with an administrative fee. *Id*. After all, the Complaint only alleges that Defendant *sometimes* charged an administrative fee, [29] ¶ 73. Further, Plaintiffs did not submit the sample Settlement Statements to substantiate the administrative fee allegation. Regardless, even putting aside the alleged damages from cash advances, Plaintiffs still allege plausible actual damages from withholding or delaying payments owed to Plaintiffs given the time value of money.

25

violations, thus that satisfies any standing requirement regardless of whether Plaintiffs are entitled to injunctive relief. Further, at this stage, the Court declines to find that Plaintiffs cannot show any risk of "future violations," since it remains unclear whether they maintain any existing or future relationship with Defendant. Accordingly, it will not dismiss the request for injunctive relief at this stage.

### B.     Count II: Illinois Wage Payment and Collection Act

Count II alleges that Defendant violated the IWPCA by failing to pay the Plaintiffs all the wages they earned; taking unlawful deductions; and failing to reimburse them for necessary expenditures such as tolls and fuel that "inure to the primary benefit of" defendant. [26] ¶¶ 121–23.

The IWPCA aims "to provide employees with a cause of action for the timely and complete payment of earned wages or final compensation, without retaliation from employers." *Bruger v. Olero, Inc.*, 434 F. Supp 3d 647, 652 (N.D. Ill. 2020 (quoting *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016)). To achieve this, the IWPCA imposes numerous obligations on employers regarding wages. To state a claim under the IWPCA, however, a plaintiff must allege the existence of an employment agreement with the defendant under which the defendant owed them wages. *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016). The IWPCA does not require a "formally negotiated contract" so long as the employee can "plead facts showing mutual assent to terms that support the recovery." *Chagoya v. City of Chi.*, 992 F.3d 607, 624 (7th Cir. 2021) (quoting *Landers-Scelfo v. Corp. Off. Sys., Inc.,* 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2005)).

In moving to dismiss, Defendant argues that the Entity Plaintiffs cannot maintain an IWPCA claim because they do not qualify as "employees" under the statute. [32] at 14. It also argues that the Individual Plaintiffs failed to allege they had an agreement with defendant to pay them wages and, even if the Individual Plaintiffs had an agreement with Defendant to pay wages, the Individual Plaintiffs agreed to any of the deductions Defendant took and the deductions also were to their benefit. *Id.* at 14–19.

### 1.    Entity Plaintiffs

The Court agrees that the Entity Plaintiffs cannot maintain an IWPCA claim. The IWPCA defines employees as "individuals." 820 Ill. Comp. Stat. 115/2. The statute does not define "individuals," but it later defines "employer" to "include any *individual*, partnership, association, *corporation*, limited liability company . . . ." *Id.* (emphasis added). The inclusion of both "individual" and "corporation" in the definition of "employer" makes clear that the definition of "individual" does not include a corporate entity.

### 2.    Individual Employees During Time as Company Drivers

As for the Individual Plaintiffs, the Complaint alleges that they first worked for Defendant directly as "company drivers" before they began to work for Defendant as "contractor drivers" (through Entity Plaintiffs). The Complaint does not specify, however, whether the Individual Plaintiffs bring their IWPCA related to their time

as "company drivers." [26] (Count II).[11] Further, Plaintiffs fail to respond to Defendant's arguments directed at the Individual Plaintiffs' time as "company drivers. *See* [32] at 15–16; [38]. Therefore, Plaintiffs impliedly concede that they have not alleged a viable IWPCA claim based upon their time as "company drivers." *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (finding that failure "to respond to an argument . . . results in waiver.").

### 3.    Individual Plaintiffs During Time as Contractor Drivers

That leaves the period during which the Individual Plaintiffs worked as "contractor drivers." At this stage, Defendant does not argue whether the Individual Plaintiffs qualify as "employees," generally. [32] at 15 n.10. Instead, Defendant argues that the Complaint fails to allege that Defendant had an agreement to pay them wages during the period they worked as "contractor drivers." *Id.* at 16. Defendant insists that the Complaint shows, as a matter of law, that it only had an agreement to pay the Entity Plaintiffs pursuant to the terms of the Lease Agreements and that Defendant "specifically denounced any employment relationship or any agreements to pay wages to the Individual Plaintiffs once they became contractor drivers." *Id.* at 16–17.

Employers have tried to circumvent the IWPCA, and statutes like it, by requiring that individuals work through a third-party corporate entity. The courts in Illinois and the Seventh Circuit frequently reject these end-runs and find a

---

[11] The only allegations that the Complaint includes regarding the Individual Plaintiffs' time as "company drivers" relate to unpaid training, but they make no allegations regarding whether they had an employment agreement, implied or otherwise, during that period.

28

plausible employment agreement with individuals, even if the individuals were paid through a corporate entity. *See, e.g., Johnson v. Diakon Logistics,* No. 16-CV-06776, 2018 WL 1519157, at *9 (N.D. Ill. Mar. 28, 2018) (finding that, despite Johnson contracting through a corporation rather than as an individual, "it is reasonable to infer . . . that Johnson and Diakon agreed on Johnson working for and being paid by Diakon."); *Bruger,* 434 F. Supp. 3d at 655–56 (finding an implicit employment agreement between the parties despite independent contractor agreements signed by plaintiffs "in their capacities as sole owners of corporate entities."); *Labuz v. Ill. Workers' Comp. Comm'n,* 981 N.E.2d 14, 22 (Ill. App. Ct. 2012) (noting that "the label the parties place upon their relationship is a factor of minor significance in our appraisal of the parties' relationship."). *Cf. Craig v. FedEx Ground Package Sys., Inc.,* 335 P.3d 66, 92 (Kan. 2014) (answering the Seventh Circuit's certified question regarding the employment status of FedEx drivers and finding the drivers qualified as employees under Kansas' analogue to the IWPCA notwithstanding an independent contractor agreement).

Defendant attempts to distinguish this case from some of those above, but its efforts prove unpersuasive. For example, it acknowledges that, in *Johnson,* the court found that it was "reasonable to infer" that "the parties agreed on the individual plaintiff working for defendant" even though they had payments go through the plaintiff's company. [43] at 16. It insists, however, that here the Complaint unequivocally shows that it "did not assent to paying the Individual Plaintiffs." *Id.*

Defendant misstates *Johnson.* The *Johnson* Court held that it could infer, at

29

the motion to dismiss stage, an *implicit* agreement that the defendant would employ and pay the individual plaintiff notwithstanding the parties' *explicit* agreement that the defendant would pay the plaintiff's company.  The Complaint's allegations here warrant the exact same inference:  namely, even though Defendant had explicit Lease Agreements with Entity Plaintiffs, the Court can reasonably infer an *implicit* agreement with the Individual Plaintiffs.  Accordingly, the fact that Defendant signed Lease Agreements with the Entity Plaintiffs rather than the Individual Plaintiffs does not preclude the Individual Plaintiffs' IWPCA claim at this stage.

### 4. Whether Complaint Plausibly Alleges Impermissible Deductions

The IWPCA prohibits an employer from taking wage deductions unless, as relevant here, the employee gives "express written consent given freely at the time" of the deduction or the "deductions are to the benefit of the employee."  820 Ill. Comp. Stat. 115/9.

The IWPCA also requires that employers "reimburse an employee for all necessary expenditures or losses incurred by the employee within the employee's scope of employment and directly related to services performed for the employer."  *Id.* at 115/9.5.  It defines a "necessary expenditure" as an expense "required of the employee in the discharge of employment duties" and "that inure to the primary benefit of the employer." 820 Ill. Comp. Stat. 115/9.5

Defendant argues that, even if the Individual Plaintiffs alleged a plausible employment agreement, all the deductions it took comply with the IWPCA because the Individual Plaintiffs expressly consented to the deductions through the Lease

Agreements. It also argues that these deductions inured to Plaintiffs' benefit because they allowed the Plaintiffs to generate revenue by delivering Defendant's cargo. [32] at 17–18. Finally, it argues that the deductions do not qualify as "necessary expenditures or losses." *Id* at 18–19.

In response, the Individual Plaintiffs first insist that the Lease Agreements cannot establish their "express written consent" because only the Entity Plaintiffs signed those agreements. But, as discussed, the Lease Agreements provide the only agreement to pay wages that the Complaint plausibly alleges. The Individual Plaintiffs cannot rely upon the Lease Agreements to establish a wage agreement, but then argue the Lease Agreement does not apply to them with respect to agreed-to deductions.

Turning to the complained-of deductions,[12] the Court agrees with Defendant that the Lease Agreements establish, as a matter of law, "express written consent given freely at the time", 820 Ill. Comp. Stat. 115/9, as to the Tag Program, electronic logging device, and insurance deductions because, as discussed above with respect to the TIL regulation claim, the Lease Agreements specify the exact amount of these complained-of deductions.

In arguing to the contrary, Plaintiffs insist that the signed Lease Agreements cannot constitute "express written consent" for even the deductions it expressly discloses because the "agreements were not signed 'at the time the deduction is made.'" [38] at 14. But Illinois law states that for deductions that continue over time,

---

[12] Count II broadly refers to "unlawful deductions," [26] ¶ 122, but the Court only considers those deductions that the Complaint actually identifies.

an agreement qualifies as "freely given at the time the deduction is made" if the agreement "provides for that period of time, provides for the same amount of deduction each period and allows for voluntary withdrawal for the deduction." Ill. Admin. Code tit. 56, § 300.720 (2014) (providing regulations on "written agreement authorizing deductions" from wages or final compensation). The Lease Agreements meets these requirements with respect to these three deductions.

As discussed above, however, the same cannot be said, at least at this stage, for the charges for fuel, PrePass and Tablet Internet. So too for any "toll" fees about which Plaintiff complains, since Defendant just conclusory states in its reply that the Lease Agreements fully disclose "toll charges." [43] at 19. And as to the "failure to communicate" charge, it remains unclear whether this qualifies as "freely given," since it is not a periodic deduction but more like a penalty.[13] Finally, as to the escrow and maintenance account deductions, even though the Lease Agreements provide the amounts Defendant will deduct to *fund* those accounts, it remains a separate question whether the Individual Plaintiffs freely consented to the deductions that Defendant ultimately took from the money deposited in those accounts.

Further, Defendant has not established, as a matter of law, that these deductions are "to the benefit of the employee." Defendant insists that they benefit the Individual Plaintiffs because these deductions allowed them to defer costs and make money from delivering Defendant's cargo. [32] at 18. But by that reasoning, every deduction would inure to an employee's "benefit" so long as the employer

---

[13] Defendant made no argument specific to this deduction, so the Court considers any potential argument waived at this stage.

conditions wage payments on it. Such an absurd result cannot stand. Defendant has not offered a credible basis, at this stage, to find that the deductions qualify as "to the benefit of" the Individual Plaintiffs. Accordingly, Defendant has not established, as a matter of law, that this exception applies to these deductions.

Finally, Defendant argues that these deductions do not qualify as "necessary expenditures" for which Defendant must reimburse employees because a "necessary expenditure" must "inure to the primary benefit of the employer," 820 Ill. Comp. Stat. 115/9.5, and these deductions inure "to the benefit of" the Individual Plaintiffs. Having already rejected Defendant's argument that the deductions inure "to the benefit of" the Individual Plaintiff, this argument fails.

## IV.     Conclusion

For the foregoing reasons, the Court grants in part, and denies in part, Defendant's Motion to Dismiss [31]. The Court dismisses Count I as the Individual Plaintiffs and Count II as to the Entity Plaintiffs. The Court also dismisses Count I as to the "Tag Program," penalty for failing to communicate, "electronic logging device," and insurance charge-backs, but otherwise denies the Motion as to Count I. The Court also dismisses Count II as to the period in which the Individual Plaintiffs were "company drivers" and as to the "Tag Program," "electronic logging device", and insurance deductions, only.

Dated: September 25, 2023          Entered:

John Robert Blakey
United States District Judge

33